## SUCCESSION OF JOSEPH FOWLER.

Where, for a number of years, an agent rendered important services to his principal, although there was no contract for compensation, nor any intention to charge for his services while their relations existed; yet, where, from their habits of friendly intercourse and from the evidence, it may be inferred that the one intended and the other expected that, upon the termination of those relations, a liberal reward would be made for the services, and the principal died intestate and without making any reward, the agent may recover from the succession a reasonable compensation.

The general rule of the Louisiana Code is, that a mandate is gratuitous; but where, from the nature of the business or conduct of the parties, it appears that no such thing was intended or expected, the law is otherwise.

It cannot be presumed of one who has been released from his debt to a creditor, by a discharge in bankruptcy, that services, subsequently rendered to the creditor, as agent, are intended to be gratuitous; and the fact that friendly relations existed between the parties, does not assist the presumption. A moral obligation cannot compensate one which is legal.

APPEAL from the Second District Court of New Orleans. *Lea*, J.
*John R. Grymes*, for the plaintiff: The appellants oppose all compensation, and insist that the relations between the parties are to be governed by the law of mandate, which, they say, is in its nature gratuitous, and none can be allowed under Art. 2960 of the Civil Code. For all the purposes of this case, the appellee is perfectly willing to meet them on this ground.

It is admitted that, by the Roman law in its earlier stages, the contract of mandate was gratuitous in its nature and in its essence, but the spirit of progress, and the necessities of the more complicated nature of human affairs, compelled the Roman jurisconsults to relax the rigour of the law in this respect, and although they would not allow the action *mandati*, yet they would allow the action, *prescriptis verbis* or *in factum*, as on a contract without name, a *persecutio extraordinaria*. But, by the laws of France, under the regime of the Code Napoleon, and under the Louisiana Code, although the contract of mandate is in its nature gratuitous, it is not so in its essence. The court will find this matter very satisfactorily treated and explained by Mr. Troplong, in his work, Du Mandate, No. 154 to No. 175 inclusive. See also 18th Duranton, No. 197.

Such is the doctrine, long established in this State, under the legislation of the Louisiana Code. The contract of mandate is not essentially gratuitous; a contract for compensation is lawful. Express proof of it is not required, it may be implied, from the nature of the services and all the circumstances of the case. *Decoux's Heirs* v. *Plantevigne*, 10 L. R., 503. *Waterman* v. *Gibson*, 5th Ann. 672.

But the appellee is persuaded that, independent of the contract and law of mandate, the law entitles him to, and will give him an action to recover, a reason-

| | |
|---|---|
| 7 | 207 |
| 44 | 728 |
| 7 | 207 |
| 47 | 342 |
| 7 | 207 |
| 49 | 778 |
| 49 | 1422 |
| 7 | 207 |
| 52 | 461 |
| 7 | 207 |
| 105 | 601 |
| 105 | 803 |
| 7 | 207 |
| 119 | 214 |

SUCCESSION OF
FOWLER.

able compensation for the services rendered the deceased in his lifetime, under the circumstances developed by the evidence in the record, on the principles laid down by this court. *O'Reily* v. *McLeod*, 2d Ann. 146. *Police Jury* v. *Hampton*, 5 N. S. 389. 5 R. R. 181. 18 L. R. 539. L. Code, arts. 2274, 2278.

See also Rolland de Vellarque Traite du Notoreal *verbo* mandat, vol. 4, p. 449, No. 11. Merlin R. de Juris, vol. 21, *verbo* notaire, §6, No. 4, and the decisive argument of Pothier there quoted. Dalloz, 1827, part 2, p. 184, a case exactly like the present. Journal du Palais, vol. 21, p. 337. Project du code du commerce, prepared by Livingston and others, art. 189. Sirey, vol. 27, part 2, p. 102. Sirey, vol. 36, part 2, p. 503. Journal du Palais, vol. 21, p. 129.

The appellee therefore prays that the judgment of the court below may be reformed or reversed, as he has prayed in his answer to this appeal, now on file, and that, in all other respects, it may be affirmed.

*Roselius*, and *Race* and *Fosler*, for defendant: How does it happen that *Mr. Bogart* does not make any charge for his valuable services rendered previously to the year 1843? This question is answered by the fact that, in 1842, he applied for, and obtained a discharge from his debts, under the Act of Congress, establishing a uniform system of bankruptcy. He was, of course, bound to make a surrender of all his property, embracing all claims he might have a right to make against his debtors, to his creditors. But no claim whatever against *Joseph Fowler* is found on his schedule. How can *Mr. Bogart* account for this omission, except on the ground that he had no claim against *Mr. Fowler*? In order to obtain the benefit of the bankrupt law, and have all his debts cancelled and expunged by a decree and discharge in bankruptcy, he was bound to divest himself of every thing he owned, or was due to him, in favor of his creditors. *Joseph Fowler* was one of his creditors for upwards of sixty thousand dollars, consequently, if he had any offset to make against this large debt, is it possible to believe that he would have omitted to state it?

What then is the irresistible conclusion to be drawn from these facts? No other than this, that the claim for fifty thousand dollars is a mere after-thought; and that if *Fowler* had lived, *Mr. Bogart* would never have had the remotest idea of making it; nay, that the kind offices rendered by *Bogart* to *Fowler*, proceeded from the noblest motives of human action; gratitude for the benefits conferred, and feelings of friendship, originating from the intimate relations which had so long subsisted between them, commencing as far back as 1825, when *Mr. Bogart* was first employed by *Fowler* as his confidential clerk.

Now, we would ask, by what course of reasoning can an impartial and intelligent mind be brought to the conclusion, that it ever entered into the contemplation of either *Bogart* or *Fowler*, during the lifetime of the latter, that the services rendered by the former should be compensated by the payment of fifty thousand dollars, or any other sum of money? From what source does this pretended obligation arise? It is admitted that the services were rendered as agent; and the law is express, that "the procuration is gratuitous, unless there have been a contrary agreement." C. C., art. 2960. But the learned counsel for the appellee insists, that this agreement need not be proved to have been made in express term, and that it may be established by implication; or, in other words, that it may be inferred. It was hardly necessary to cite authorities in support of a position which is self-evident. There are few contracts indeed, the existence of which may not be implied from facts and circumstances. One of the most important frequent contracts, that of sale, is, in many cases in commercial dealings, implied from the contract and acts of the parties. No one, therefore, would even seriously contend that an agreement to pay an agent a compensation for his services might not be implied. But, on the other hand, it is equally plain that there must be some other foundation for the implication, than any thing that is disclosed by the evidence in this record.

We all agree that the contract of mandate, according to the law of Louisiana, is, by its nature, gratuitous, instead of being essentially so, as under the Roman law. The inquiry then arises, what is of the nature of a contract? This question is answered by the second paragraph of the 1757th article of the Code: "things, which, although not essential to the contract, yet are implied from the nature of such agreement, if no stipulation be made respecting them, but which the parties may expressly modify or renounce, without destroying the contract,

or changing its description; of this nature is warranty, which is implied in every ~SUCCESSION OF~ sale, but which may be modified or renounced, without changing the character ~FOWLER.~ of the contract, or destroying its effect." See Pothier on Obligations, No. 7.

Hence, the gratuitous character of the contract of mandate is understood when no express or implied stipulation to the contrary has been made by the parties. In the present case, it is not pretended that an express agreement to compensate the mandatory for his services, has been shown : the question then recurs, is there any evidence, or are there any circumstances from which it may be implied? There are none, unless the disappointment of *Mr. Bogart*, in not being remembered in Fowler's will, be considered so. Indeed, the whole argument of the learned judge of the district court seems to rest on that fact. All the acts and declarations of *Mr. Bogart*, already referred to, so utterly irreconcilable with the pretensions now set up by him, are attempted to be accounted for and explained away by his expectation of a remunerative legacy ! Fortunately for the peace and harmony of society, litigation is rapidly decreasing; but, let it once be known, that every disappointed legacy hunter can maintain an action for the recovery of fifty thousand dollars against a wealthy succession, for his apparently disinterested acts of friendship and attention to propitiate the good will of the rich man while living, and the dockets of our courts will soon be crowded. But, if *Mr. Fowler* intended to reward his friend for the services rendered, by remembering him in his will, how does it happen that he destroyed the will which he had made.

Not a single one of the cases cited by the counsel for the appellee, supports the position in support of which they are invoked.

The leading principles applicable to the case, are developed with great force and clearness by Troplong, in his treatise on Mandate, No. 153, *et seq.*

The only case in point is that of *Jacob et al.* v. *The Ursuline Nuns*, 2 M. R. 269. 1 Greenleaf, § 15, 27. C. C. 2270. *Elkin's Heirs* v. *Elkin's Ex.*, 11 L. R. 224. 13 Wendell, p. 464. 4 Dallas, 111. 13 Johns. R. 379, are also referred to.

By the court:

PRESTON, J. *Joseph Fowler* departed this life in September, 1850. He died intestate and without heirs in this State. He was possessed of a very large estate in New Orleans, and *W. Bogart* was appointed curator of his succession.

In July, 1851, he rendered the account of his curatorship and claims from the estate, besides his commisions, the large sum of fifty thousand dollars. The heirs oppose its allowance.

In answer to their opposition, he stated as the grounds of his claim, that it is for constant and continuous and uninterrupted attention to all the business of the deceased, for the whole of the period, from 1843, to the time of his death, the deceased being a large owner of real estate in the city of New Orleans, requiring constant attention to the renting and repairing his houses, collecting the rents, and all other attention and services necessarily incidental to a large mass of such property. The deceased was also a capitalist, dealing largely in money, making loans on mortgage, and discounting notes to a large amount, all of which was attended to, solely and exclusively by the respondent, constantly and unremittingly, his counting room being the place where all the books, papers, and valuables of the deceased were deposited.

His witnesses in support of the claim are, *R. J. Palfrey*, the cashier of the bank in which the deceased kept his personal assets, consisting, at his death, of good bills, receivable notes and mortgages, amounting to upwards of eight hundred thousand dollars; *J. K. Smith and L. F. Generes*, extensive money brokers, who had large transactions with him ; *Samuel J. Peters and W. H. Avery*, both presidents of banking corporations, and old established merchants of New Orleans ; *Lavillebeuve*, a merchant and large property holder ; *J. W. Montgomery*, a large capitalist, and who appears to have been intrusted

SUCCESSION OF with an olographic will of the deceased, but which was destroyed; *Mr.*
FOWLER.  *Grymes,* his confidential counsellor; and *Dr. Rushton,* his physician.

All these gentlemen were well acquainted with the deceased and his business, the relations between him and the claimant, and, in general, the means by which his vast fortune was accumulated. Their testimony makes out fully and satisfactorily, the grounds stated by *Mr. Bogart,* as the basis of his claim.

The deceased laid the foundation of his fortune by great activity, and energy and good judgment in mercantile operations. Retiring with a considerable capital, and uncommon sagacity and knowledge of men and things, he selected the claimant as his agent, through whom still to operate with his capital on the bills, notes, and other evidences of credit, so exclusively the medium of our commerce. That his selection was fortunate, is proved by the result; the ball was kept rolling and increasing in magnitude, to the hour of his death. While a different selection might have proved disastrous, from circumstances peculiar to *Fowler,* to which some of the witnesses allude.

His physician says, he was in bad health during the whole of the seven years, for which compensation is claimed; that he had fallen into such a disposition, that he would walk a mile to save a dime, but would not cross the street to make thousands. Although the remark of the witness was probably intended merely to illustrate his character, those acquainted with the effects of avarice upon age and infermity, know that it is literally true, rather than a mere illustration of the character of a miser; and yet he was daily making large sums through the instrumentality of his agent. He was, at the same time, saving dimes by denying himself the comforts and even necessaries of life, as proved by the physician; whilst he was on the eve of losing a very large sum, as proved by his counsel, from mere listlessness, though warned of the danger, and which was saved by the promptness and energy of his agent when it was communicated to him.

In the latter part of his life, there were physical inabilities which rendered the services of the agent the more invaluable to him. At one time he was confined six months by sickness. He became intemperate and was hypochondriacal, saying he would die in a week, when, but for the effect of intemperance on his debilitated and irritable system, he would possibly have lived to an old age. He was also often absent during the summers.

The aggregate testimony of the claimant's witnesses shows, that the deceased referred all his customers and business to him, and kept it all in his counting house, and that whether he was sick or well, present or absent, the agent was, to use the expression of one of the witnesses, substantially his curator for three years before his death. These gentlemen, men of the highest standing in the community, estimate his services as worth fifty thousand dollars to *Fowler,* during the seven years. *Mr. Urquhart,* an extensive agent for absent capatalists and property holders, furnished the court with specific data upon which he acts, which appear very reasonable, and which would fully justify the demand of the claimant.

On the other hand, the heirs show two very large operations, amounting to $130,000, which *Mr. Fowler* transacted personally. They show that he discounted the paper of the mercantile firm of the agent, to the amount of upwards of $200,000, and that his credit gave them great facilities in the commercial world, and patronage from the planters of our country. They urge that the agent was obliged to avail himself of the benefit of the bankrupt law,

and was then indebted to the deceased in a sum of $60,000, which there is a <span style="float:right">Succession of<br>Fowler.</span> moral obligation upon him to pay; and that he has received $30,000 for commissions, as curator of the estate.

There was no contract between the parties, nor do we think any intention on behalf of the claimant, to ask payment for his services while their relations existed. But we do firmly believe, from their relations and the evidence, that the one intented, and the other expected, that if their relations terminated, a very liberal reward would be made for those services. The nature and character of aged avarice rendered it morally impossible, that that reward would be made during life, and the early and long continued friendship of the parties, and great reciprocal kindness, rendered it impossible to ask it until *Mr. Fowler's* death, or other separation.

Can the compensation then be legally demanded from the heirs of the deceased? The general rule of our code is, that a mandate is gratuitous; but is it so, if the nature of the business or conduct of the parties show, that no such thing was intended or expected. The contrary is the well settled jurisprudence of France, under a code very similar in its provisions to our own. In preparing a commercial code for our State, our distinguished jurisconsults expressly engrafted the principle into their project, and it is so perfectly conformable to every man's sense of justice, that we feel bound to act on the principle; and, in fact, did adopt it in the case of *Waterman* v. *Gibson*, 5th Ann. 673. The cases of *Jacob* v. *The Ursuline Nuns*, 2 M. R., and *Elkin's Heirs* v. *His Executor*, seems to recognize the principle, that if it could be reasonably concluded that compensation was contemplated by both parties, it should be made.

Now, in addition to the testimony of his witnesses, a book is before the court, showing the accounts kept by the claimant of the transactions of the deceased, in the purchase of notes, bills and mortgages, and collections of his rents. It is well kept, and shows the transactions to have been of the largest character. The mental and manual labor of keeping the accounts, making the calculations of interest, securing the investments and collecting the principal and interest, making the rent rolls and bills, and collecting the rents, keeping the property in repair, insuring it, and securing good tenants, must have been so considerable, that no man could think of giving or receiving it for nothing.

Whilst, however, the books show the labor and responsibility of the agency to have been great, the evidence convinces us, that the value of the claimant's services to the deceased consisted, principally, in the skill and judgment with which he managed his immense business, so that it produced such a wonderful result. The business being, as the deceased stated over and over again, intrusted principally to that skill and judgment, or, as he expressed himself, more than to his own. The agent did not give advice alone, as contended, but exercised his own judgment and moral responsibility in investing the funds of his principal. He is not to be considered a mere clerk, of whose salaries *Mr. Robb, Mr. Peters* and *Mr. Avery*, give an account.

It does not appear that the relatives and heirs of the deceased, during these seven years, had any connection with, or influence over him, or extended to, or received any kindness from him. On reading the testimony in this record, they must see and feel that their deceased relative has received from a stranger to them, the greatest kindness and services, which relieved him from the burdens of business, for which he was physically inadequate, and probably protracted his sickly, intemperate, and irritable life; thus increasing by time alone their

vast inheritance, and, thereby, that the toil, skill and judgment of that stranger has been invaluable to them, when separated from their relative by a no doubt unreasonable aversion, which is proved. We do not think the laws interpose any obstacle to his demand for a reasonable compensation from them.

As already mentioned, they contend, that prominent facts proved by them, justify their opposition to the claim, even if well founded in law.

They say, that in applying for the curatorship of the estate, he represented that there were no creditors, and could not therefore be a creditor himself. He was not; he owed the estate far more, immediately or contingently, than he could possibly expect to recover for his services.

They contend, that the claimant availed himself of the benefit of the bankrupt act of 1841, being a large debtor of the deceased, and that there is a moral obligation to make payment, and the debt should be compensated against his services. The moral cannot be opposed to the legal obligation of the heirs to compensate his services. Besides, by an examination of the testimony, we find that the deceased realized nearly his whole debt and interest, out of property purchased at the bankrupt sale. It is notorious, that large mortgagees on large property, were enabled to purchase it at the bankrupt sales for small sums, and did so, to a great extent, to avoid the expenses of the sales for large prices. The property purchased by the deceased from the assignee of the claimant, was placed also under his charge, and, by his skill and management, the debt was realized by the deceased, so that perhaps the moral obligation to pay it is extinguished.

The heirs say, that the claim should not be allowed, because the claimant obtained the curatorship of the estate of the deceased, and thereby realized in a single year thirty thousand dollars out of the estate in commissions, as curator. But these commissions are allowed by law, as the legal compensation for the trouble and responsibility of administering the estate, and are not dependant at all upon the relation of debtor and creditor between the curator and the estate.

All the heirs were absent when *Fowler* died. It was in the middle of what is called our sickly season, when strangers are deterred from coming to New Orleans. The estate was vacant, and immediate action necessary for its preservation. Circumstances necessarily subjected the heirs to the expense of the commissions, whether the claimant administered or not. If he had not, persons less qualified by intimate relations with the deceased, would have administered, and successfully claimed the same commissions.

It is said, the credit given by the deceased to *Mr. Bogart* and his house, amply compensated him for all his services. The services are palpable, and susceptible of legal appreciation by testimony. The credit given by a business mutually beneficial, is not susceptible of precise appreciation in money. The claimant contends, and proves by the books, that the deceased received as high interest for the loans to himself and house, as from other customers, and that, to his knowledge, his investments with them were equally secure.

Still, the evidence satisfies us that this matter should be well considered, in fixing the compensation to be allowed the claimant. And for two other striking and many minor reasons, we do not feel authorized to adopt, as the measure of his remuneration, the large estimate made by his witnesses.

1. The claimant might have insisted, which in all cases is the true course, on a precise and definite understanding with his employer. He being a man, not only not generous, but penurious, would in all probability have insisted on a

small compensation, although payable only when their relations should termi-
nate; and having right to do so, we must consider his views, as well as those of
his agent.

In the next place, notwithstanding the judicious and successful administration
of *Fowler's* property, yet the agent was able to devote all the time necessary to
carry on the large mercantile business of his own house, which was greatly
aided in its operations by the discounts of *Fowler*, although based upon the
principle of interest.

Without entering into further minutiæ, upon a full consideration of the whole
record, we should have come to the same conclusions with the District Judge,
and therefore affirm his judgment, with costs.